UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-80136-CIV-MARRA/MATTHEWMAN

RICHARD OHRN,

Plaintiff,

vs.

JP MORGAN CHASE & CO., and
CHASE INVESTMENT SERVICES CORP.,

Defendants.
_____/

## OPINION AND ORDER

This cause is before the Court upon Plaintiff/Counterdefendant's Motion for Summary

Judgment on Counterclaim (DE 128) and Defendants' Motion for Partial Summary Judgment

(DE 134).  The Court has carefully considered the Motions and is otherwise fully advised in the

premises.

I.  Background

The facts, as culled from affidavits, exhibits, depositions, answers, answers to

interrogatories and reasonably inferred therefrom in a light most favorable to the non-moving

party, for the purpose of this motion, are as follows:

On his first day of employment, Plaintiff Richard Ohrn ("Plaintiff") entered into an

agreement dated July 13, 2009 with Chase Investment Services Corp. ("CISC"), the predecessor

to Defendants JPMorgan Chase Bank, N.A. and J.P. Morgan Securities, LLC (collectively,

"Defendants").  (Agreement, Ex. 1, DE 134-1.)  The Agreement is between Plaintiff and CISC

"for the benefit of itself and all of its affiliated entities, including JPMorgan Chase & Co. and its

subsidiaries . . . ." (Agreement at 1.) "JPMC" was defined in the Agreement as "JP Morgan

Chase & Co. and its direct and indirect subsidiaries" which included CISC. (Agreement at 1.)   In

the Agreement, Plaintiff agreed not to solicit Defendants' customers for one year after his

employment ended.  The Agreement provided:

> you understand and agree for a period of twelve (12) months after your employment with
> JPMC terminates for any reason that you may not on your own behalf or that of any other
> persons or entities, directly or indirectly solicit or attempt to solicit, induce to leave or divert
> or attempt to induce to leave, initiate contact with or divert from doing business with JPMC,
> any then current customers, clients or other persons or entities that were serviced by you or
> whose names became known to you by virtue of your employment with JPMC, or otherwise
> interfere with the relationship between JPMC and such customers, clients or other persons
> or entities.

(Agreement ¶ 8(a).)

The Agreement further provided with respect to Defendants' confidential information that

Plaintiff would:

> (a) to maintain the confidentiality of Confidential Information at all times during and after
> your employment with JPMC; (b) not to disclose or communicate Confidential Information
> to any third party unless permitted by JPMC policy, required by law, or with JPMC's written
> consent; and (c) not to use Confidential Information for your own benefit or for the benefit
> of a third party.

(Agreement ¶ 7(d).)

The  Agreement  defined  "Confidential  Information"  to  include  "names,  addresses  and

telephone numbers of customers and prospective customers." (Agreement ¶ 7.1(b).)   In the

Agreement, Plaintiff agreed that: "any advertisement or announcement received by a JPMC customer

from your or from any entity competing with JPMC and with which you are employed or associated

shall be conclusively presumed to constitute solicitation. . . ." (Agreement ¶ 8(f).)  In addition, the

Agreement provides, "No provision of this Agreement may be amended, modified, or waived unless

such amendment, modification, or waiver is agreed to in writing, and signed by you and by an authorized officer of JPMC." (Agreement ¶ 18(b).)

On June 8, 2011, the day before Plaintiff ceased working for CISC, he signed an Affirmation of Employment Status. (June 8, 2011 Agreement, Ex. 2, DE 67-2.) In the June 8, 2011 Agreement, Plaintiff agreed: "I understand that all records and confidential information of CISC, including the names and addresses of its clients are and shall remain the property of CISC at all times during my employment with CISC and after my termination of employment for any reason with CISC." (June 8, 2011 Agreement.) Plaintiff then began working in a similar position with Wells Fargo Advisors, LLC ("Wells Fargo"). (Am. Compl. ¶ 14.)

When asked about his contact with Defendants' customers, Plaintiff testified as follows:

Q: When did you inform Mr. Goldstein that you were moving to Wells Fargo?
A: I called him, I believe in July, the beginning, early part.
. . . .

Q: What did you tell him when you called him?
A: I just said, "Did you receive the postcard?" He said that he did, and he asked what it meant with his accounts, and I said, "Quite frankly, you can stay at Chase or you can come with me. It is totally up to you. He said he would like to stay with me, he had known me for quite some time and he liked the relationship.
Q: He proceeded to move his accounts over?
A: Yes.

(Pl. Sept. 26, 2013 Dep. 77-78, DE 135-1.)

Plaintiff testified that he did not solicit any of CISC's customers and the postcard did not state he could service them. It just stated that he accepted a position with another firm. (Pl. Sept. 26, 2013 Dep. 324.) Plaintiff further testified as follows:

Q: " . . . you previously testified that shortly after going to work for Wells Fargo Advisors you had a Wells Fargo postcard sent to over 500 Chase customers. Do you remember that testimony?

. . . .

A:      Yes.

Q:      You also testified that you provided the name and addresses of every one of those customers to Wells Fargo; do you recall that?

A:      Yes.

(Pl. Feb. 28, 2014 Dep. 370, DE 135-2.)

Q:      And when you provided that information, the information for these over 500 folks to Wells Fargo, did you do it all at once or did you do it in increments?

A:      I think I gave them two books, if I remember correctly. I don't think I gave them the full shot all at once.  I think it was a two-week period and I think I gave them two versions of it."

(Pl. Feb. 28, 2014 Dep. 385.)

Q:      . . . The Chase customers who received a Wells Fargo postcard with your name on it, you provided those names and addresses to Wells Fargo, correct?

A:      Yes.

Q:      They did not have the name of Chase customers and their addresses that you had serviced with Chase until you provided those to them, correct?

A:      Not that I'm aware of, right.

. . . .

Q:      You had a few customers who a postcard was sent to bring the postcard to you at Wells Fargo, correct?

A:      I did.

Q:      And based on the postcard they brought you, it looked like what we've marked as Exhibit 1?

A:      Yes, but it was in color.

(Pl. Feb. 28, 2014 Dep. 370-72.)

4

John Estrella, the corporate representative for CISC, stated that it would not be a violation of the Agreement if Plaintiff, in response to a client inquiry, told the client that he went to work for Wells Fargo. (Estrella Dep. 10-11, DE 148-6.)  Nor were employees of CISC prohibited from telling customers where Plaintiff went to work. (Estrella Dep. 11.)  Estrella was not aware of any time when CISC tried to persuade its customers to stay with them rather than transfer their accounts to Wells Fargo or whether CISC communicated to Wells Fargo that it wanted its customers back. (Estrella Dep. 7-8.)

Three of Plaintiffs' CISC customers testified that the postcards they received did not cause them to transfer their accounts to Wells Fargo. (Lois Kemper Dep. 36, DE 128-2; Nancy Ehrlich Dep. 70, DE 128-3; Robert Petricone Dep. 28, DE 128-4.)  Ms. Kemper, however, testified that Plaintiff did call her before moving over to Wells Fargo. (Kemper Dep. 26.)  Plaintiff testified that he provided information relating to several CISC customers to Wells Fargo, who then received a postcard and became Wells Fargo customers. (Pl. Dep . 405-07.)   Plaintiff also testified he telephoned CISC customers about his move to Wells Fargo. (Pl. Dep.77.)  Approximately seven million dollars of CISC customer accounts transferred from CISC to Wells Fargo within the first six months after Plaintiff resigned and went to work for Wells Fargo. (Estrella Dep. 14.)

CISC never sought injunctive relief against Plaintiff, even though the employment agreement provided for that relief. (Agreement ¶ 10(b)(i).)  Defendants sought leave to bring a counterclaim for breach of contract on October 30, 2013 against Plaintiff after Plaintiff admitted at his  September 26, 2013 deposition that he contacted clients.[1]   (Plaintiff Dep. 63, 77; Estrella Dep. 15; Counterclaim, DE 61.)  Defendant's in-house counsel stated in June of 2012 that Plaintiff violated

---

[1] The state court case was removed to this Court on February 7, 2013. (Compl., DE 1.)

the non-solicitation agreement. (Hill Aff., DE 148-7.)

Prior to the counterclaim being filed, Plaintiff had relied on CISC's failure to object to: (1) Plaintiff providing the customer lists to Wells Fargo and (2) the notification sent to CISC customers that Plaintiff had gone to work for Wells Fargo. (Pl. Aff ¶ 2, DE 148-10.) Plaintiff states he would now be prejudiced if he were forced to give up the commissions and fees he earned at Wells Fargo that were derived from providing services to customers that he had serviced while employed at CISC who transferred their accounts to Wells Fargo. (Pl. Aff. ¶ 3.) Plaintiff provided Wells Fargo with the information of the 500 people, including names, addresses, telephone numbers and descriptions of accounts. (Pl. Dep . 385; Customer Lists, Ex. 1, DE 160-1.) Alec Ardito, the corporate representative of Wells Fargo, testified that he told Plaintiff he could not solicit CISC customers, but he could mail announcement cards, which Wells Fargo did not consider solicitation. (Ardito Dep. 18-20, DE 148-11.)

According to Plaintiff's friend, Michael Godovic, while Godovic was at Hurricane Grill[2] at around five or six p.m., there was a group of about eight people, with three or four of them wearing Chase logo shirts, meeting for a happy hour. (Godovic Dep. 33, 60-61, DE 148-3.) A few members of the group broke away to talk about Plaintiff. (Godovic Dep. 30, 64.) Godovic overheard people say that Plaintiff stole from the bank and that Plaintiff was unethical and his investments were not approved by management. (Godovic letter attached to Aff., DE 148-4; Godovic Dep. 64, 68; Note, DE 148-5.)

Godovic testified as follows:

---

[2] Hurricane Grill is located in the same shopping plaza as the Chase Bank. (Patey Dep. 39.)

Q:      Did you see or witness or hear anything to indicate that the name calling or other statements in the same context as Rick Ohrn were made while those people were acting as employees for Chase Bank?

A:      No.

Q:      Did you see or witness anything to indicate that any Chase entity officially authorized the negative statements you allegedly overheard about Mr. Ohrn?

A:      No.

(Godovic Dep. 44.)

Nora Patey, a Chase co-worker's ex-girlfriend, also overheard comments made about Plaintiff at two different bars during happy hours. (Nora Patey letter attached to Aff., DE 44; Patey Dep. 40, DE 148-16.) The events did not appear to be sponsored by Chase Bank and no one was providing her with investment advice at the time. (Patey Dep. 40-42, 53.) Zachary Kern, a former co-worker, also overheard comments about Plaintiff at local bars. (Kern Dep. 109, 123; DE 135-5.)

Defendants move for partial summary judgment. Specifically, Defendants argue that they are entitled to partial summary judgment on the breach of contract counterclaim based on Plaintiff's admission that he breached the Agreement. With respect to Plaintiff's defamation claim, Defendants claim they are entitled to partial summary judgment on the statements made by Defendants' employees that were outside the scope of their employment or not made in the actual performance of their duties. Plaintiff responds that, with respect to the counterclaim, there is a lack of evidence regarding causation, the term "solicitation" is not defined in Plaintiff's employment agreement, and the counterclaim is barred by the doctrines of waiver, ratification, estoppel and laches.

Plaintiff moves for summary judgment on Defendants' counterclaim, claiming that there is no record evidence of causation based on the testimony of three witnesses who testified that the postcards did not cause them to transfer their accounts from CISP to Wells Fargo. Defendants respond that there is ample evidence that Plaintiff breached the Agreement.

7

II.  Summary Judgment Standard

The Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The Court should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 323.  To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case.  Id. at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) and (B).

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim.  Anderson, 477 U.S.

8

at 257.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  <u>Walker v. Darby</u>, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted."  <u>Anderson</u>, 477 U.S. 242, 249-50.

### III. Discussion

### A. Breach of Agreement

Defendants move for partial summary with respect to liability, but not damages, on their counterclaim for breach of contract.  In so moving, they rely on the sections of the Agreement that prohibits Plaintiff from "directly or indirectly solicit[ing]" or "initiat[ing] contact with" "any then current customers, clients or other persons or entities that were serviced by your or whose names became known to you by virtue of your employment with JPMC."  (Agreement ¶ 8(a).)

Significantly, it is undisputed that Plaintiff, soon after starting his employment with Wells Fargo, a competitor of Defendants, provided the names and addresses of over 500 of Defendants' customers to Wells Fargo for the purpose of mailing those customers an announcement of Plaintiff's new position.  (Pl. Feb. 28, 2014 Dep. 370.)  Plaintiff also made follow-up telephone calls with his customers, asking them if they received his postcard. (Pl. Sept. 26, 2013 Dep. 77-78.)  Based on the language of the Agreement and the testimony of Plaintiff, the Court finds, as a matter of law, that Plaintiff's conduct constitutes a breach of the Agreement.[3]

---

[3] Defendants have produced the Agreement as evidence of the existence of a contract and Plaintiffs do not challenge that this element is met.  <u>See</u> <u>Rollins, Inc. v. Butland</u>, 951 So.2d 860, 876 (Fla. Dist. Ct. App. 2006) (the elements of the cause of action for breach of contract are: (1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach).

Nonetheless, Plaintiff contends that summary judgment is not warranted because (1) there is a lack of evidence regarding causation; (2) the term "solicitation" is not defined in the Agreement and (3) Defendants have not challenged Plaintiff's affirmative defenses of waiver, ratification, estoppel and laches.

With respect to causation, the Court notes that Plaintiff seeks summary judgment that there is no record evidence demonstrating that the breach of contract was the proximate cause of Defendants' damages.  In so arguing, Plaintiff relies on record evidence that three customers who testified either that: (1) they could not recall whether they received a postcard or (2) they would have transferred their accounts to Wells Fargo regardless of the postcard.  The Court finds that this evidence both fails to raise a genuine issue of material fact (with respect to Defendants' motion for summary judgment) or to demonstrate, as a matter of law, no evidence of causation (with respect to Plaintiff's motion for summary judgment).  Here, the counterclaim alleges that Plaintiff solicited over 500 customers, therefore the testimony of these three customers does not bear on the remaining customers.  Furthermore, Defendants have also shown that Plaintiff telephoned other customers, which also violates the Agreement.

Nor does the Court agree with Plaintiff that there is an "absence of any evidence either in the affirmative or negative of causation." (DE 128 at 5 citing Zurich Am. Ins. Co. v. BASF Corp., No. 08–80255–CIV, 2012 WL 443229 (S.D. Fla. Feb. 10, 2012).)   In Zurich, the Court found that the plaintiffs failed to provide expert (or even non-expert) testimony to establish the alleged defects in the products at issue.  Id. at * 5.  In contrast, Defendants provided evidence that Plaintiff breached the Agreement and that millions of dollars of customer accounts were transferred to Wells Fargo within six months after Plaintiff resigned from Defendants' employ.  Unlike the need to show

10

causation in a products liability case like Zurich, the case here permits the reasonable conclusion that the breach of the Agreement by Plaintiff caused Defendants' damages.[4]

Next, the Court rejects Plaintiff's claim that the term "solicitation" is ambiguous based on the lack of a definition in the Agreement.  Indeed, "[t]he lack of a definition of an operative term does not, by itself, create an ambiguity." Amerisure Mut. Ins. Co. v. Albanese Popkin The Oaks Development Group, L.P., No. 09-81213-CIV, 2010 WL 4942972, at * 5 (S.D. Fla. Nov. 30, 2010). With respect to the highlighted testimony of  Estrella by Plaintiff, that testimony does not change the fact that the Agreement prohibited the action that Plaintiff took.  Nor does the testimony of a Wells Fargo witness have any bearing on the interpretation of Defendants' Agreement.

Finally, the affirmative defenses of waiver, ratification, estoppel and laches raised by Plaintiff are based on the notion that Defendants waived the breaches of the Agreement because they did not file the counterclaim until nine months after Plaintiff sued them.  There is, however, a disputed question of fact on this point.  On one hand, the record shows that Defendants were not aware of their claim until after they conducted a deposition of Plaintiff.  (DE 66 n.1.)  On the other hand, Plaintiff has submitted an affidavit from his attorney, Michael Hill, that states that Defendant's in-house counsel told him in June of 2012 that Plaintiff violated the non-solicitation agreement.  (Hill Aff., DE 148-7.)  "The crux of the waiver doctrine rests upon conduct demonstrating an intent to relinquish a known right."  See Mid-Continent Cas. Co. v. Basdeo, 742 F. Supp. 2d 1293, 1330 (S.D. Fla. 2010).  Simply put, the Court cannot make this determination as a matter of law based on this

---

[4] The Court rejects Plaintiff's reliance on Kilpatrick v. Breg, Inc., 613 F.3d 1329 (11th Cir. 2010).  That case discussed causation in the context of expert testimony in which doctors did not "systemically and scientifically rule out" a final cause of the disease at issue, or put another way, the doctors did not demonstrate a reliable methodology.  Id. at 1342.

record.  See Dusich v. Horley, 525 So. 2d 507, 509 (Fla. Dist. Ct. App. 1988) ("summary judgment is particularly unsuitable in those cases where the facts and circumstances indicate the possibility of waiver and estoppel").

Based on the foregoing, the Court grants partial summary judgment to Defendants with respect to a determination, as a matter of law, that Plaintiff breached the contract.  However, Plaintiff has raised a genuine issue of material fact as to whether his affirmative defenses preclude Defendant from enforcing the breach.  The Court denies Plaintiff's motion for partial summary judgment on the counterclaim.

B.  Slander Per Se

Defendants seek partial summary judgment on the statements allegedly made by Defendants' employees at the local bars and overheard by Godovic, Patey and Kern.  In so moving, Defendants contend that vicarious liability does not exist for these statements because the statements were not made when the employees were acting within the scope of their employment and the language was not used in the actual performance of their duties.  Plaintiff disagrees, claiming that whether an employee's action is within the scope of his/her employment duties is a question of fact.  Additionally, Plaintiff also claims that even if these statements are not admissible as independent slanderous statements, they are admissible as evidence of the fact that these statements were made and repeated at the direction of their supervisors and that the statements are probative of Defendants' malicious intent.

In Florida, a corporation may be liable for its employees' slanderous comments.  Diplomat

12

Electric, Inc. v. Westinghouse Electric Supply Co., 378 F.2d 377, 381 (5th Cir. 1967).[5]   In

determining a corporation's liability, Florida courts look at the following:

> (a) Was the person who uttered the slanderous words an authorized agent of the corporation? (b) If so, was he at the time acting within the scope of his employment? [and] (c) Was the language charged used in the actual performance of his duties touching the matter in question?

Schreidell v. Shoter, 500 So. 2d 228, 232 (Fla. Dist. Ct. App. 1986) (quoting Baker v. Atlantic Coast

Line R. Co., 192 So. 606 (1939)).  Here, the statements were made at a local bar during happy hour

and there is no record evidence that these statements were made in the scope of their employment

and in the actual performance of their duties.  For that reason, partial summary judgment is

warranted.  See Vinson v. Gulf Life Ins. Co., 357 So. 2d 778, 779 (Fla. Dist. Ct. App. 1978)

(summary judgment affirmed when the plaintiff offered no evidence that statements were  made in

scope of employment with the defendant); cf. Bell v. Novartis Pharm. Corp., No.

8:08-cv-30-T-17-EAJ, 2008 WL 2694893, at * 4-5 (M.D. Fla. July 3, 2008) (granting a motion to

dismiss where the plaintiff did not identify a time frame in which the employee made the comment

and how the statement was made in the performance of the employee's duties).

     The Court is not persuaded by Plaintiff's reliance on Columbia By the Sea, Inc. v. Petty, 157

So. 2d 190 (Fla. Dist. Ct. App. 1963).  In that case, the court found there was a question of fact as

to whether the assault in question was committed by the employee in the service of his employer.

Id. at 194.  There, the plaintiff objected to a charge on his restaurant bill, an employee of the

---

[5] The decisions of the United States Court of Appeals for the Fifth Circuit, as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit.  Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

restaurant was summoned, the plaintiff left the restaurant and proceeded to an adjacent motel which, while a distinct operation, had an arrangement to include restaurant bills on the motel bills. Id. at 191. There, the employee told the restaurant to put the bill on the motel bill and a fight ensured between the plaintiff and the employee.  Id.

Plaintiff makes much of the fact that the incident in Columbia occurred outside of the restaurant and at a different business establishment.  (DE 148 at 16.)  However, the Columbia court noted that those facts meant that it was necessary to determine whether the incident was a "continuation of an altercation having as it inception a disagreement arising while the parties were involved with the master's business" or whether the incident occurred after the business dealings for which the person was on the employer's premises had been completed.  Id. at 193-94.  The instant case, however, occurred at a bar, outside of work hours, and therefore does not raise the same factual issue.  Moreover, because Columbia concerned an assault, it did not address whether the defamatory statements occurred in the actual performance of the employee's duties.[6]

Finally, with respect to Plaintiff's arguments pertaining to admissibility at trial, the Court finds that these arguments are premature and can be raised at trial.  The Court grants partial summary judgment to Defendants on Plaintiff's slander claim as set forth in this Order.

---

[6] For this same reason, the Court does not find helpful Plaintiff's reliance on Richardson v. City of Pompano Beach, 511 So. 2d 1121 (Fla. Dist. Ct. App. 1987), an excessive force case at the motion to dismiss stage, and Aloff v. Neff-Harmon, Inc., 463 So. 2d 291 (Fla. Dist. Ct. App. 1984), an assault case.  In addition, with respect to Aloff, the court pointed out conflicting evidence regarding whether the employee at issue was in the scope of her employment or in a purely social undertaking at the time of the assault.  Id. at 294. Here, Plaintiff has not pointed to any facts that raise a genuine issue of material fact.

14

IV.  Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1)      Plaintiff/Counterdefendant's Motion for Summary Judgment on Counterclaim (DE 128) is **DENIED**.

2)       Defendants' Motion for Partial Summary Judgment (DE 134) is **GRANTED IN PART AND DENIED IN PART**.

   **DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 1st day of August, 2014.

_____
KENNETH A. MARRA
United States District Judge

15